**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BRENDA BERGMAN, | Case No. 16-cv-1179-BAS(KSC) |
| Plaintiff, | **ORDER:** |
| v. | **(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 21);** |
| FEDERAL EXPRESS CORPORATION LONG TERM DISABILITY PLAN, *et al.*, | **AND** |
| Defendants. | **(2) DENYING DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT (ECF No. 22)** |

Plaintiff Brenda Bergman alleges that Defendant Federal Express Long Term Disability Plan ("FedEx") and Defendant Aetna Life Insurance Company ("Aetna") (collectively "Defendants") denied her long term disability ("LTD") benefits under the LTD plan provided to her as an employee of FedEx. Specifically, Bergman alleges that her LTD benefits were terminated prematurely on December 31, 2014. Aetna made the determination to terminate her LTD benefits as the claims administrator of the FedEx plan. After an unsuccessful appeal of this termination to the Aetna reviewing board, Bergman commenced this action against both Defendants under the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. §§ 1001-1461. Both sides have now brought cross motions for summary judgment.

The Court finds these motions suitable for determination on the papers submitted and without oral argument. *See* Civ. L. R. 7.1 (d)(1). For the following reasons, the Court **<u>GRANTS</u>** Bergman's Motion for Summary Judgment (ECF No. 21) and **<u>DENIES</u>** Defendants' motion for summary judgment (ECF No. 22). The Court requests further briefing on damages before entering a final judgment.

## I.    Background

Bergman began working for FedEx over thirty years ago in 1984, and until April 2015 she was employed as a Senior Service Agent. Her position was considered a "heavy occupation." (Administrative Record ("AR") 006.) Her job consisted of assisting customers, managing records, and completing other office tasks. (AR 185.) Her job requirements included "ability to lift 75 lbs. [and] ability to maneuver packages of any weight above 75 lbs. with appropriate equipment and/or assistance from another person," but stated "lifting requirements may be modified with district HCMP approval." (*Id.*) As an employee of FedEx, she was covered under FedEx's Short Term Disability ("STD") Plan and LTD Plan. (Pl. MSJ at 2.)[1] Both plans are governed by ERISA. 29 U.S.C. §§ 1001-1461. Bergman was found to be disabled under the STD plan and received STD benefits from May 12, 2014 to November 9, 2014. (AR 001, 4.) Bergman started to receive LTD benefits on November 10, 2014, but her LTD benefits were terminated on December 31, 2014. (*Id.*) The parties dispute the termination of Bergman's LTD benefits.

### A.    FedEx's Disability Plan

Under Section 1.1 of the STD and LTD plan, "disabled" means:

> either an Occupational Disability or a Total Disability;
> provided, however, that a Covered Employee shall not be

---

[1] "Pl. MSJ" refers to Plaintiff's Motion for Summary Judgment (ECF No. 21) and "Def. MSJ" refers to Defendants' Cross Motion for Summary Judgment (ECF No. 22). "Opp." refers to the parties' respective opposition papers (ECF Nos. 24, 25) and "Reply" to the respective reply papers (ECF Nos. 26, 27).

deemed to be Disabled or under a Disability unless he is, during the entire period of Disability, under the direct care and treatment of a Practitioner and such Disability is substantiated by significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms.

(AR 551-52.) "Occupational Disability" is defined as "the inability of a Covered Employee, because of a medically-determined physical or functional impairment . . . to perform the duties of his regular occupation" (AR 555-56), and "Total Disability" is "the complete inability of a Covered Employee, because of a medically-determinable physical or functional impairment . . . to engage in any compensable employment for twenty-five hours per week" (AR 559).

For the LTD plan, FedEx served as the plan administrator, and Aetna served as the third party claims paying administrator. (AR 549.) In some circumstances under the LTD plan, FedEx would serve as both the plan and claims paying administrator, but that is not the case for the LTD plan at issue. (AR 361-63, 466-67.) Here, FedEx had delegated the authority to Aetna to make claim determinations and administer benefit claims. (AR 361.) "Subject to [FedEx's] overall authority," Aetna had the "discretionary authority to interpret Plan provisions and determine benefit claims." (*Id.*) According to the FedEx employee benefits handbook, employees must contact Aetna directly to begin their claim for STD benefits, and should complete and return all of the forms and information requested by Aetna to Aetna. (AR 466-67.) Once the period for STD benefits lapses, Aetna would then "start the LTD claims process at the appropriate time and will contact [the employee's] health care professional for documentation." (AR 467.) Additionally, if a LTD claim was denied, Aetna would communicate this decision to the employee, provide her with information regarding how to appeal the decision and what additional information she should provide, and conduct a review of any appeal (done by the Aetna Appeals Review Committee). (AR 469-72.) Other than an employee

1   keeping her supervisor informed of her status, FedEx was not involved in the benefit
2   determination or appeal process. (AR 466-67.)

4   **B.    Bergman Applied For And Was Granted STD Benefits.**

5        On May 5, 2014, Bergman was examined by a physician assistant, Tannis
6   Bolton. (AR 096.) Bergman was 53 years old at the time. (*Id.*) According to P.A.
7   Bolton's medical examination, Bergman was injured on April 25, 2014, and suffered
8   a previous industrial injury in mid-1990. (*Id.*) P.A. Bolton noted that stress from
9   Bergman's work duties of lifting packages increased pain in her neck, back, and right
10  arm to "severe," and data entry also aggravated her neck and arm pain. (*Id.*) She
11  observed that Bergman has "an abnormal posture – appears stiff from upper back to
12  neck while sitting in chair," "loss of cervical lordosis," "neck stiffness or splinting,"
13  "[p]osterior cervical tenderness," and "[s]pasms of the neck muscles," among other
14  things. (AR 096-97.) P.A. Bolton also stated that Bergman complained of arm, upper
15  back, and knee pain, including tingling in the right arm and "frequent or severe
16  headaches" in the last five years. (*Id.*) Bergman was diagnosed with cervical
17  radiculopathy and a cervical sprain. (AR 097). The prescribed treatment plan
18  included ongoing pain medication, work restrictions ("Limited use of hand" and "No
19  overhead work. No lift, no pull and no push"), and additional testing. (AR 096.)

20       P.A. Bolton examined Bergman again on May 8, 2014. (AR 103-05.) P.A.
21  Bolton described Bergman's symptoms similar to the previous visit and noted the
22  same diagnosis and provided similar work restrictions. (*Id.*) Bergman was again
23  examined on May 20, 2014 with similar observations, except her work restrictions
24  were lifted slightly to allow for some limited lifting, pushing, and pulling of items up
25  to five pounds. (AR 118-21.) The May 20 examination noted that Bergman's care
26  would be transferred to Dr. Paul Kim, an orthopedic spine surgeon, the following
27  month. On May 30, 2014, Bergman attended another follow-up with P.A. Bolton,
28  and though it was noted that Bergman's "symptoms are somewhat improved over her

initial visit," P.A. Bolton found that the "radiculopathy and spasm persist[ed]" and that Bergman's biggest complaint was pain. (AR 016-18.) The pain treatment and work restrictions continued, and additional physical therapy sessions were added. (AR 018.)

On June 4, 2014, Bergman met with Dr. Kim, the orthopedic spine surgeon. (AR 129.) He noted her complaints of neck and right arm pain. (*Id.*) Dr. Kim reviewed Bergman's x-ray, which demonstrated a "loss of disc height at C5-C6 and C6-C7." (AR 132.) He also reviewed Bergman's June 4, 2014 MRI and noted it demonstrated "moderate stenosis at C5-C6 with moderate-to-severe bilateral neuroforminal stenosis and moderate stenosis at C6-C7." (AR 132; *see also* AR 128 (June 4, 2014 MRI analysis by San Diego Imagining).) Dr. Kim detailed in his medical report that he and Bergman had a long discussion about treatment options, and that after prior attempts at non-surgical treatment for her symptoms, Bergman wanted to "take care of this problem at this time" with surgery, one of Dr. Kim's recommendations. (AR 132.) He further noted that "[i]t is medically reasonable that the mechanism of injury as described by the patient caused the symptoms and need for treatment." (AR 133.) On July 18, 2014, Dr. Kim performed a two-level cervical discectomy and fusion surgery on the C5, C6, and C7 discs, which he detailed in his medical report. (AR 025-27.) The pre- and post-operative diagnoses were the same: cervical stenosis and cervical radiculopathy. (AR 025.) The surgery was free of complications. (AR 026.)

Bergman met with Dr. Kim a month later on August 20, 2014 as a follow-up to her back surgery. (AR 028-30.) Dr. Kim observed that Bergman was "overall feeling better" and was without arm pain, though her neck pain persisted. (AR 028.) Bergman had weaned off the stronger pain medication, but was still using medication for pain management. (*Id.*) Dr. Kim's diagnosis was cervical radiculopathy on the right side, cervical stenosis (moderate-to-severe at C5-C6 and moderate at C6-C7), and neck pain. (AR 029.) He determined she was temporarily totally disabled. (*Id.*)

Dr. Kim saw Bergman again on September 18, 2014. (AR 031-33.) His diagnosis and Bergman's work status remained unchanged, and he found that her future medical status was "unclear at this time, depends on what her clinical progress is." (AR 032.) Dr. Kim also noted some improvements, including a reduction in pain medication, and that he reviewed two cervical x-rays at this visit. (AR 031-32.) Bergman's next appointment a month later was largely the same, with additional complaints of pain, which Dr. Kim verified as mild para-trapezial tenderness. (AR 034-36.)

On November 20, 2014, Dr. Kim noted that Bergman's neck and arm pain was "a little better," but she was "having some bilateral numbness and pain." (AR 037-39.) X-rays were taken at the appointment, and he noted a "positive Phalen's [test] and positive median nerve compression test." (AR 037-38.) Dr. Kim added carpal tunnel to Bergman's assessment/diagnoses and made a respective treatment plan. (AR 038.) Bergman's status was upgraded to temporarily partially disabled. (Id.) Dr. Kim met with Bergman a couple weeks later on December 4, 2014, and had similar observations. (AR 040-42.) He also ordered an EMG nerve conduction velocity test. (AR 040-41.)

Bergman met with Dr. Warren for the EMG testing on December 17, 2014. (AR 165.) Dr. Warren reported that he was specifically testing for "entrapment or compressive neuropathy, as well as the possibility of cervical motor radiculopathy." (Id. (providing observations from the EMG test on December 24, 2014).) Dr. Warren found the exam was normal and was reluctant to diagnose Bergman with carpal tunnel syndrome. (Id.) He also found that her EMG was "very benign looking" for motor radiculopathy, but did "not rule out the possibility of sensory radiculopathies." (Id.)

A day later, on December 18, 2014, Dr. Kim examined Bergman and noted that her pain had decreased to "minimal," but that she had "decreased sensation in a non-dermatomal fashion" with "some pain over the A1 pulleys of the second and fifth fingers on the left and right side." (AR 043-45.) Bergman still tested "mildly

positive" to the Phalen's test, and she was scheduled to see Dr. Serocki, a hand specialist. (AR 044.) Bergman's assessment/diagnoses were cervical radiculopathy, cervical stenosis (moderate-to-severe at C5-C6 and moderate at C6-C7), neck pain, and possible trigger finger. (*Id.*) Bergman's work status remained temporarily partially disabled, and Dr. Kim restricted her work abilities to no lifting, pulling, or pushing over ten pounds, required her to wear a splint, and reduced her work day to four hours with a ten minute break every thirty minutes. (AR 165.)

### C.    Aetna Granted And Then Terminated Bergman's LTD Benefits

Aetna determined that Bergman was disabled under the LTD plan from May 12 to December 31, 2014, and that she had substantiated this status with "significant objective findings." (AR 006-08.) For her disability claim, Bergman had provided the medical reports and testing (dated prior to December 31, 2014) described above. (*Id.*; *see also* AR 001-03 ("[T]he medical information submitted provided significant objective findings that you were unable to perform the duties of your job as a Sr Service Agent/Non-DOT during that timeframe.").) Bergman received STD benefits from May 12, 2014 to November 9, 2014, and LTD benefits from November 10, 2014 to December 31, 2014. (AR 004.)

On January 20, 2015, Aetna initiated a physician peer review by Dr. James Wallquist of Bergman's ongoing claim for LTD benefits. (AR 167-171.) Dr. Wallquist recognized that Bergman had already qualified for LTD benefits from November 10 to December 31, 2014.[2] (AR 168.) Dr. Wallquist reviewed the medical reports from Dr. Kim and Dr. Warren (it seems that P.A. Bolton's examinations were not provided or reviewed for this review). (*Id.*) Dr. Wallquist contacted Dr. Kim's

---

[2] Dr. Wallquist classifies these benefits as short term disability, but this is in error and contrary to the other evidence in the AR. (AR 168.) Dr. Wallquist also errs in stating that "[a]s of 1/1/15, [Bergman] was six and a half months post cervical fusion surgery" when Bergman's surgery was July 18, 2014, or five and a half months prior to the review. (AR 168, 170.)

office three times for a peer-to-peer consultation on January 8, 12, and 15, but never received a call back. (AR 170.) Ultimately, Dr. Wallquist determined "there was a lack of significant updated quantifiable physical examination findings and diagnostics to correlate with the claimant's subjective complaints." (AR 170-71.)

On January 30, 2015, Aetna informed Bergman that her LTD benefits were terminated, effective December 31, 2014, because her claim for continuing disability was not supported by any objective findings beyond that date. (AR 006-08.) Aetna's letter stated that "there are no objective finding to support a continued disability" and contained a few lines regarding the type of objective findings that were lacking. (AR 006.) The letter noted that Aetna attempted to reach Dr. Kim three times, but was unable to speak with him. (*Id.*) It also included a general description regarding how to appeal and perfect one's claim, but no specifics were given for Bergman's case nor did the description discuss Aetna's need to speak with a treating physician.

### D.   Appeal Process

On March 14, 2015, Bergman timely appealed the termination decision. (AR 010.) In her appeal letter, she stated that she was still under care of Dr. Kim and included further medical documentation. (*Id.*) Bergman later requested an extension of time to perfect her appeal, specifically noting she wanted to submit information from her upcoming April 3, 2015 appointment with Dr. Kim. (AR 011.) Bergman stated in this request that she had faxed over other documents, and that she thought these were "probably enough at this point, but just thinking, you will need these visit notes anyway, in the long run." (*Id.*) Bergman's appeal included the following additional physician examinations and test results.

On February 4, 2015, Bergman had a CT scan and San Diego Imaging provided an analysis of this test. (AR 046.) The analysis compared her current CT scan to that of her pre-surgery June 4, 2014 MRI, and stated, among other things, that Bergman had "posterior osseous spurring caus[ing] mild to moderate central canal

stenosis as well as neural foraminal stenosis, similar to that seen on [the previous] MRI." (*Id.*) The report further observed "[m]inimal to mild uncovertebral osseous spurring at C3-4 and C4-5" and "straightening of the cervical lordosis, positional or due to muscle spasm." (*Id.*)

Dr. Kim's report from February 5, 2015 documented that he reviewed the February 4 CT scan and found that there was a "solid fusion at C5-C6 and C6-C7" and that Bergman "look[ed] radiographically fused and her CT scan look[ed] better than what her symptoms [were]." (AR 047-49.) But he also stated that the cervical stenosis was "moderate-to-severe at C5-C6 [and] moderate at C6-C7." (*Id.*) Additionally, he recommended to "keep the same [work] restrictions" (which included modified work of limiting Bergman's lifting to ten pounds, mandating ten minute breaks every thirty minutes, and shortening her work day to four hours) with the additional treatment of a Lidoderm patch. (AR 046-49.) He lastly stated "[w]e will see how she does. . . . Hopefully, we can get her to a point where she is functional; however, return back to work to full duty is guarded." (*Id.*)

A month later, on March 5, 2015, Dr. Kim examined Bergman following her visit with Dr. John Serocki, an orthopedic hand surgeon. (AR 050-51, 54-57.) Dr. Serocki noted Bergman's complaints of pain, but did not find an "identifiable specific pathology in the hands or wrists that [was] likely to be causing her symptoms" and deferred treatment to Dr. Kim. (AR 051.) Dr. Kim recounted Bergman's complaints of pain and that her recent CT scan showed "some residual foraminal stenosis; however, none of which correlate[d] with her symptoms." (*Id.*) He recommended that Bergman see a rheumatologist and "hold off on work for one month," and downgraded her status to total temporary disabled. (*Id.*)

On April 3, 2015, Bergman was examined by Dr. Phong H. Tran, a pain management specialist. (AR 061-63.) Dr. Tran noted Bergman's complaints of pain, which were aggravated by movement and included numbness and tingling; her current employment status as total temporary disabled; and her current medication

treatment plan. (AR 062.) Dr. Tran also observed tenderness and spasms in Bergman's cervical paravertebral muscles, "cervical compression caus[ing] pain bilaterally," tenderness to palpitation in the trapezius muscles, and range of motion in Bergman's knees was decreased and painful with tenderness and Apley's compression. (*Id.*) Bergman was prescribed an extensive pain medication plan, and her status remained temporarily totally disabled. (AR 062-63.)

During the appeal process, Bergman and Aetna were in communication regarding the process and status of Bergman's appeal, including whether Aetna had received complete sets of Bergman's documents. (*See, e.g.*, AR 322.) Additionally, on April 27, 2015, Bergman spoke to Aetna and told them that Dr. Tran was now her primary treating physician. (*Id.*)

### E.     Bergman's Appeal Is Denied.

Prior to Aetna's final decision on Bergman's claim, Dr. Robert Cirincione conducted the physician's peer review for the appeal process in May 2015. (AR 172-77.) Dr. Cirincione listed the various documents he reviewed, including physician exams, medical tests, and work status reports. (AR 173 (listing almost forty different medical documents)).) He additionally stated that he called Dr. Kim on May 6, 2017 (despite Bergman informing Aetna that her treating physician had changed) and was informed by Dr. Kim's office that he was no longer treating Bergman and would not give an opinion in her case. (AR 176.) Dr. Cirincione did not state whether he tried to contact Dr. Tran, or any of Bergman's other treating physicians, but noted that he had "unanswered" questions regarding Bergman's examinations and Dr. Kim's medical findings. (*Id.*) Aetna did not seek an independent physical examination of Bergman. (*See* AR 172-177.)

After reviewing all of the documents submitted by Bergman, Dr. Cirincione concluded that the "records do not support any significant objective findings that would support a functional impairment that would preclude the claimant from

performing her normal duties from 1/1/15 to the current time." (AR 177.) He discussed four pieces of evidence in reaching his decision: (1) Drs. Kim and Serocki noted Bergman had normal neurologic exams; (2) Dr. Tran stated Bergman's motor power was normal; (3) Dr. Tran observed diminished sensation, though this was inconsistent with Bergman's December 24, 2014 EMG of her upper extremities; and (4) Bergman's February 4, 2015 CT scan showed a solid two level fusion. (*Id.*) Dr. Cirincione further reasoned that given "these objective findings" and the "lack of clinical documentation of abnormal objective findings," Bergman had not supported her claim that she could not perform "the essential duties of her occupation." (*Id.*)

On June 2, 2015, Bergman received notice that her appeal was denied. Bergman commenced this action with the Court on May 16, 2016.

## II.    Discussion

### A.    The Standard Of Review For Aetna's Denial Of LTD Benefits Is Abuse Of Discretion.

"In the ERISA context, 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *Harlick v. Blue Shield of Cal.,* 656 F.3d 832, 838-39 (9th Cir. 2011) (quoting *Nolan v. Heald Coll.,* 551 F.3d 1148, 1154 (9th Cir. 2009) (internal quotation marks and citation omitted)). Generally, the standard of review afforded to decisions by fiduciaries in ERISA cases is *de novo. See Standard Ins. Co. v. Morrison*, 584 F.3d 837, 846 (9th Cir. 2009). When the LTD plan contains a discretionary clause, however, an abuse of discretion standard of review applies instead. *See Abatie v. Alta Heath & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 956-57 (1989).

It is undisputed that Bergman's LTD plan with FedEx contained a discretionary clause. The parties instead dispute whether this discretionary clause is invalidated by California Insurance Code § 10110.6 (Pl. MSJ at 11; Def. Opp. at 1) and whether the section is preempted by ERISA (Pl. MSJ at 11; Def. Opp. at 2-4). *De novo* review is appropriate only if § 10110.6 applies and ERISA does not preempt this section. Otherwise, the Court is limited by an abuse of discretion standard. Although the Court finds § 10110.6 does apply to this discretionary clause, it also finds that ERISA preempts § 10110.6. Therefore, ultimately, the Court applies an abuse of discretion review.

### 1.     Section 10110.6 Applies To FedEx's Plan.

The relevant portion of Section 10110.6 states:

> a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed . . . that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage . . . that provision is void and unenforceable.

Cal. Ins. Code § 10110.6(a). A "provision that reserves discretionary authority" is defined as a provision that "confer[s] discretion on an insurer or other claims administrator to determine entitlement to benefits" and that would "lead to a deferential standard of review by any reviewing court." Cal. Ins. Code § 10110.6(c) "[I]f any discretionary provision is covered by the statute, 'the courts shall treat that provision as void and unenforceable.'" *Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan, Plan No. 625*, 856 F. 3d 686, 692 (9th Cir. 2017).

Section 10110.6 would clearly apply to the discretionary clause in the LTD plan because it confers discretion to FedEx (or Aetna) to construe the terms of the plan and make eligibility and benefit determinations, causing the standard of review to shift to abuse of discretion.

Because § 10110.6 applies to this discretionary clause, the Court must determine whether § 10110.6 regulates FedEx's self-funded LTD plan. While this motion was pending, the Ninth Circuit ruled in *Williby v. Aetna Life Ins., Co.*, 867 F.3d 1129 (9th Cir. 2017), that a company's self-funded plan qualifies as insurance under § 10110.6 because the California Insurance Code defines "insurance" broadly, and can cover some self-funded plans under the code. Thus, though § 10110.6(a) is limited to "a policy, contract, certificate, or agreement . . . that provides or funds life *insurance* or disability *insurance* coverage," § 22 of the California Insurance Code's broad definition of "insurance" applies to any "contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." *Williby*, 867 F.3d at 1134 (quoting Cal. Ins. Code § 22) (emphasis in original). Hence, § 10110.6 regulates more than traditional insurance policies, including non-insurance companies engaged in "insurance." *See id.*

The Court finds that, because FedEx's LTD plan provided "insurance"—as defined under the California Insurance Code—§ 10110.6 applies. FedEx's LTD plan meets the two elements required by § 22: (1) shifting risk of loss from one party to another and (2) distributing that risk among similarly situated people. Cal. Ins. Code § 22; *see also Auto. Funding Grp., Inc. v. Garamendi*, 114 Cal. App. 4th 846 (2003). Upon a finding that an employee is no longer able to work, FedEx's LTD plan contractually promises to pay that employee a portion of his or her compensation. (AR 565.) This agreement shifts the risk of an injury or disability from the employee to FedEx, which FedEx then distributes across all the other employees in the plan. *See Williby*, 867 F.3d at 1134 (citing additional authority).

## 2. ERISA Preempts Section 10110.6 For FedEx's Self-Funded Plan.

Although § 10110.6 negates the discretionary clause in this case, the Ninth Circuit has made it clear that ERISA preempts § 10110.6. *Williby*, 867 F.3d at 1137

16cv1179

("ERISA therefore applies to [defendant's] self-funded STD plan and preempts § 10110.6's application thereto.").

The Ninth Circuit reaches this decision by analyzing the three relevant interrelated provisions governing the preemption of state law: the preemption clause, the saving clause, and the deemer clause. *Id.* (citing *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990)). The preemption clause states that ERISA "shall supersede any and all State laws insofar as they may . . . relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a); *see Williby*, 867 F.3d at 1135 (citing *Orzechowski*, 856 F.3d at 692). The saving clause carves out a group of state laws regulating "insurance, banking, or securities" that are "saved" from preemption (except as provided in the deemer clause). 29 U.S.C. § 1144(b)(2)(A); *see Williby*, 867 F.3d at 1135. Lastly, the deemer clause "qualifies the scope of the saving clause, reviving preemption for certain laws that the saving clause might otherwise carve out from the preemption clause." 29 U.S.C. § 1144(b)(2)(B); *Williby*, 867 F.3d at 1135. Specifically, the deemer clause states that no ERISA employee benefit plan "shall be deemed to be an insurance company or other insurer . . . for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts." 29 U.S.C. § 1144(b)(2)(B). Thus, "a state insurance regulation is preempted to the extent it operates directly on an ERISA plan, even if its stated intent is not pretextual." *Williby*, 867 F.3d at 1136 (citing *FMC Corp.*, 498 U.S. at 61-65).

In this case, FedEx's plan is self-funded. Therefore, the deemer clause applies. *Williby*, 867 F.3d at 1136 ("[T]he deemer clause's scope turns on the presence or absence of traditional insurance."). The Ninth Circuit found a "simple, bright-line rule" emerged: "if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's insurance contracts; if the plan is uninsured, the State may not regulate it." *Id.* (quoting *FMC Corp.*, 498 U.S. at 64). Thus, when § 10110.6 is applied to FedEx's self-funded plan, which is not insured, the law falls within the deemer clause and is preempted. *See id.*

Because ERISA preempts § 10110.6, and the discretionary clause remains enforceable, the Court must review Aetna's decision for abuse of discretion.

**B.      Aetna Abused Its Discretion When It Denied Bergman's Claim.**

For the reasons stated below, the Court finds that Aetna abused its discretion when it denied Bergman's claim for continuing disability. There is no reasonable basis for Aetna's decision to terminate Bergman's LTD benefits as of December 31, 2014. The extensive record includes significant objective findings that Bergman continued to be disabled and insufficient evidence to support a reasonable determination that Bergman was no longer disabled after December 31, 2014.

**1.      Abuse of Discretion Standard Applies.**

In ERISA cases and under FedEx's LTD plan, the plaintiff bears the burden of showing that she was entitled to benefits under her LTD plan. *See Muniz v. Amec Const. Mngt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

The Ninth Circuit provides the following guidance for applying the abuse of discretion standard in ERISA cases:

> In the absence of a conflict, judicial review of a plan administrator's benefits determination involves a straightforward application of the abuse of discretion standard. In these circumstances, the plan administrator's decision can be upheld if it is grounded on *any* reasonable basis. In other words, where there is no risk of bias on the part of the administrator, the existence of a single persuasive medical opinion supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation.

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629-30 (9th Cir. 2009) (emphasis in original) (internal citations and quotations omitted). It is also an abuse of discretion if an administrator "relies on clearly erroneous findings of fact in making benefit determinations." *Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1473 (9th Cir. 1993), *overturned on other grounds.* In short, under a straightforward abuse

of discretion review, absent any factors requiring otherwise, if the Court finds that Aetna had a reasonable basis for terminating Bergman's benefits, then it must find that Aetna did not abuse its discretion.

### 2. There Is No Structural Conflict Of Interest.

In this case, there is no structural conflict of interest because FedEx funds the LTD plan and Aetna makes eligibility and payment determinations. *See Montour*, 588 F.3d at 629-30; *see also Williby*, 867 F.3d at 1138; *Abatie*, 458 F.3d at 967. Bergman argues, however, that, despite Aetna's control over the review, determination, and appeal process for LTD benefits in this case, FedEx functions as both the funder and claims paying administrator, and thus a structural conflict interest exists. (Pl. MSJ at 15-16.) Bergman points to language in the agreement that describes FedEx as the "Plan Administrator" with discretion to interpret the plan and make eligibility decisions. (Pl. MSJ at 16.) However, this is not the case for Bergman's LTD plan. While FedEx may make some claim determinations for other plans, it does not do so for the LTD plan at issue. The facts are clear that Bergman's LTD plan is self-funded by FedEx, but Aetna independently manages the eligibility and benefits determination process. (AR 361-62 ("For some Plans, FedEx has delegated authority to an insurance company to administer benefits claims under the Plan."); 521-22 ("The Claims Paying Administrator shall . . . be empowered to interpret the Plan's provision in its sole discretion in accordance with its terms . . . .").) There is no evidence in the record that FedEx had any input into terminating Bergman's LTD benefits. Instead, Bergman and Aetna communicated directly about her claim, Aetna received Bergman's medical records directly, and Aetna's letters and FedEx's employee benefits handbook advised her to only discuss her benefits claim with Aetna directly (other than alerting her supervisor of her condition). (*See, e.g.*, AR 001-03; 322; 466-67); *see Williby*, 867 F.3d at 1138 (finding no conflict of interest when defendant's self-funded plan was administered by Aetna).

Thus, the Court finds there was no structural conflict of interest and will not review Aetna's decision with additional scrutiny for this reason.

### 3. Other Factors Exist Requiring Additional Skepticism.

Once the Court determines no structural conflict of interest exists, it then may look at other factors requiring additional scrutiny:

> More particularly, the court must consider numerous case-specific factors, including the administrator's conflict of interest, and reach a decision as to whether discretion has been abused by weighing and balancing those factors together. . . . Other factors [than a conflict of interest] that frequently arise in the ERISA context include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence, and whether the administrator considered a contrary SSA disability determination, if any.

*Montour*, 588 F.3d at 630 (internal citations and quotations omitted); *see also Gonzales v. Unum Life Ins. Co. of America*, 861 F. Supp. 2d 1099, 1107 (S.D. Cal 2012) ("[W]hen the administrator mishandles the claim in less [than flagrant] ways, the abuse of discretion standard will apply, however, the procedural violations 'should be factored into the calculus of whether the administrator abused its discretion.'") (quoting *Abatie*, 458 F.3d at 971-72).

Hence, even if there is no structural conflict of interest, the Court must temper the abuse of discretion review if the Court finds additional reasons to view the administrator's decision with skepticism. *See id.; see also Harlick*, 686 F.3d at 707 ("Our review of the administrator's decision is also tempered by skepticism if the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim."). *But see Williby*, 867 F.3d at 1139 (finding that one factor may not warrant extra scrutiny, but the presence of multiple factors likely would).

16cv1179

In this case, the Court finds a number of factors that warrant additional scrutiny: the failure to follow proper procedures in denying a claim, including failing to provide a reasonably clear reason for denial and communicate fully with Bergman; the absence of an in-person examination of Bergman; and the quality and quantity of medical evidence. *See Montour*, 588 F.3d at 630; *see also Harlick*, 686 F.3d at 707; *Booton v. Lockheed Med. Benefit Plans*, 110 F.3d 1461, 1463 (9th Cir. 1997).

The Court should consider a lack of communication and clarity when determining whether the claims administrator abused its discretion. *Abatie*, 458 F.3d at 974. As the Ninth Circuit stated in *Abatie*:

> An administrator must provide a plan participant with adequate notice of the reasons for denial, and must provide a full and fair review of the participant's claim. . . . Moreover, . . . an administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA. This procedural violation must be weighed by the district court in deciding whether [the defendant] abused its discretion.[3]

*Id.* (internal citations and quotations omitted); *see also Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011) ("An administrator does not do its duty under the [ERISA] statute and regulations by saying merely 'we are not persuaded' or 'your evidence is insufficient.' Nor does it do its duty by elaborating upon its negative answer with meaningless medical mumbo jumbo."); *Booton*, 110 F.3d at 1463 (finding that, if administrators fail to use "reasonably clear language"

---

[3] ERISA's required procedures state that a plan administrator must provide to every claimant a written (or electronic) notice of any adverse determination. 29 C.F.R. § 2560.503-1(g). The notice must "set forth, in a manner calculated to be understood by the claimant—(i) The specific reason or reasons for the adverse determination; (ii) Reference to the specific plan provisions on which the determination is based; (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;" (iv) how to properly appeal the decision; and, "(vii) In the case of an adverse benefit determination with respect to disability benefits . . . [a] discussion of the decision, including an explanation of the basis for disagreeing with or not following [t]he views presented by the claimant to the plan of health care professionals treating the claimant." *Id.*

when denying a claim, courts must increase their skepticism of the denial). Moreover, a part of an administrator's "duty . . . to have a meaningful dialogue with the beneficiary" includes keeping the claimant up to date with the communications that the reviewing board has, or does not have, with the claimant's doctors. *Saffon v. Wells Fargo Co. Long Term Disability Plan*, 522 F.3d 863, 873 (9th Cir. 2008) (finding the communication between Aetna and claimant was "hardly a model of clarity").

Even though Bergman has the burden of proof in front of the Court, Aetna was not absolved from having a meaningful dialogue with her. In her initial claim, Bergman submitted various medical examinations, which included analyses of Bergman's medical testing, for review. (*See* AR 167-171.) But, in Bergman's initial termination letter, Aetna provided one short generalized description of why Bergman's benefits were terminated as of December 31, 2014. (AR 006-08.) The letter fails to explain—in "reasonably clear language"—how Aetna reached its conclusion. *See Booton*, 110 F.3d at 1463. Aetna failed to explain why the medical examinations from Drs. Kim and Warren, which analyzed medical testing and included objective findings, were insufficient to support Bergman's ongoing disability, or what specific types of testing and medical exams would be sufficient. The letter also did not explain what changed in Bergman's claim that caused Aetna to change the earlier determination that Bergman was disabled, i.e. there is no explanation as to whether this was due to a change in her doctors' observations, her medical testing, or simply a lack of more recent tests or examinations. And, though Aetna's denial letter provided a general statement of how Bergman could perfect her claim (AR 007), this general description was not specific or helpful. This type of clarity was particularly important in this case because Aetna previously determined that at least some of Bergman's medical documentation amounted to "significant objective findings" to substantiate Bergman's entitlement to STD and LTD benefits. (*See* AR 001.)

Further, there is no evidence that Aetna communicated to Bergman the importance of speaking to Dr. Kim or that his medical documents and findings would be rejected or ignored without a peer-to-peer discussion (assuming this is what happened, the January 30, 2015 denial letter is not clear). (*See* AR-006-07; 172-77.) FedEx's employee benefits handbook specifically states that Aetna will ask claimants for assistance with their physicians if needed. (AR 189 ("If your health care professional does not provide [continuing disability] information, Aetna will ask for your help in obtaining the medical data.").) If Bergman had this information, she could have had the opportunity to assist Aetna with connecting to an appropriate and willing physician, or provided Aetna with more information from her doctors in lieu of a phone conversation. This was especially relevant here because the reviewing physician on appeal stated that he had questions for Dr. Kim regarding Dr. Kim's specific objective findings and stated these questions "remain[ed] unanswered."[4] (AR 176.)

Moreover, while the Court recognizes that Aetna is not required to conduct an in-person examination of a claimant, the Court is permitted to consider the absence of an in-person examination in its abuse of discretion analysis. *See Montour*, 588 F.3d at 630 (finding that for an abuse of discretion case, a court may consider

---

[4] Defendants argue that "the [initial] peer reviewer never stated it could not fully evaluate Bergman's claims based upon Dr. Kim's records without speaking to him on the telephone." (Def. Reply at 5). But this is unsupported by the record. Dr. Wallquist stated: "Had this examiner had the opportunity to peer with Dr. Kim, he would have been asked to provide quantifiable physical examination findings and updated diagnostics of the cervical spine that would preclude this claimant from performing . . . his [sic] occupation." (AR 170.) Moreover, Dr. Cirincione, the peer reviewer on appeal, stated: "If I had been able to speak to Dr. Kim I would have inquired regarding his recommendation for work and what specific objective findings on his clinical examination would have precluded [Bergman] from working. I would have noted that she had essentially a normal neurologic examination and a normal EMG and nerve conduction study and 12/17/14 of the upper extremity. I was unable to speak with Dr. Kim and therefore these questions remain unanswered." (AR 176.) This indicates to the Court that the peer reviewing physicians would have benefited from receiving more information from Dr. Kim during their review, as well as Bergman's actual treating physician at the time of the appeal, Dr. Tran. (*See* AR 322) (stating that Bergman informed Aetna on April 27, 2015, a week and a half before Dr. Kim was contacted by Dr. Cirincione, that Dr. Tran was her new physician).

"whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review" of the existing medical records). The Court takes this in consideration in its analysis, particularly because Aetna observed that Bergman had many "self-reported" or subjective complaints of pain and because the reviewing doctor on appeal discounted the treating physician's findings and stated he had "unanswered" questions based on the paper record. (*See, e.g.*, AR 003, 176; Def. MSJ at 6.) This case would have been apt for an in-person examination, but Aetna relied on the medical records only. This provides additional support for the conclusion that Aetna abused its discretion.

The Court finds that Aetna failed to follow proper procedures as required by ERISA when it failed to provide a reasonably clear explanation as to why Bergman's claim was terminated and failed to communicate with Bergman regarding how she could perfect her claim. The Court also finds that Aetna did not subject Bergman to an in-person exam, even though her claim may have benefited from one. Additionally, the Court recognizes the quantity and quality of medical evidence provided by Bergman (over forty documents from various physicians and medical personnel discussed throughout this opinion). (*See* AR 173.)

Thus, the Court reviews Aetna's decision with an increased degree of skepticism, even under an abuse of discretion standard. However, even without this enhanced skepticism, the Court finds Aetna had no reasonable basis for terminating Bergman's LTD benefits.

### 4. Pain Can Be Considered If There Are Other Objective Findings.

The Ninth Circuit has held that plans "conditioning an award on the existence of evidence that cannot exist" are "arbitrary and capricious." *Salomaa*, 642 F.3d at 678; *see also May v. AT&T Umbrella Ben. Plan No. 1*, No. 11-cv-2204-JCS, 2012 WL 1997810, at *17 (N.D. Cal. June 4, 2012) (holding that a benefits denial was

"arbitrary to the extent that it was based on [a reviewing physician's] implicit rejection of Plaintiff's subjective complaints of pain"). The Ninth Circuit has noted that pain is subjective and not readily measured in objective findings. *See, e.g., Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) (holding that pain is "completely subjective" and "cannot be objectively verified or measured"); *see also James v. AT&T West Disability Benefits Program*, 41 F. Supp. 3d 849, 879-80 (N.D. Cal. 2014) (finding abuse of discretion when evidence of chronic pain and depression were ignored). Thus, ERISA plans are prohibited from denying a claim for a lack of objective evidence if only subjective evidence of pain exists. Accordingly, courts can consider subjective complaints of pain in its abuse of discretion analysis. *See Bowen*, 885 F.2d at 602 ("[A reviewing board] may not discredit pain testimony merely because a claimant's reported degree of pain is unsupported by objective medical findings."); *see James*, 41 F. Supp. 3d at 879-80 (finding an abuse of discretion when the plan did not explain why a history of pain and pain management was insufficient ["and essentially disregarded them"] or what evidence would be considered sufficient).

Here, FedEx's LTD plan states clearly that pain alone cannot prove disability. (AR 007 ("Pain, without significant objective findings, is not proof of disability."), 188 ("[P]ain alone is not proof of disability.").) And while it seems that the terms of the LTD plan do not prohibit or exclude pain from an analysis of a claim if other objective findings are present, this is clearly what Aetna did. (AR 003 ("Although you . . . continue to complain of neck and bilateral knee pain, there are no significant deficits in range of motion or muscle strength, any neurological deficits or gait abnormalities."), 006 ("Although you continue to report subjective complaints of cervical spine pain, there was no documentation of complications from the surgery, no physical examination abnormalities, sensory impairments or motor deficits noted.").)

The Court concludes Aetna turned down Bergman's application, at least in part, because it refused to credit Bergman's symptoms of pain. *See Saffon*, 522 F.3d at 871 (criticizing a plan administrator for not explaining why he was "unconvinced" of claimant's claims of chronic pain, and for not telling the claimant or the treating physicians what they would need to do to convince him). Bergman constantly and consistently reported symptoms of pain to her treating physicians. (*See, e.g.*, AR 016-18 (noting Bergman's biggest complaint was pain); AR 043-45 (complaining of pain months after her surgery); AR 061-63 (reporting during her visit with a pain specialist that her pain was "7/10 . . . without medication").) Additionally, along with "self-reported" pain, as Defendants repeatedly coin it, there are observations of pain by her medical examiners (*see, e.g.*, AR 034-36 (verifying complaints of pain, as mild para-trapezial tenderness); 062 ("[C]ervical compression [is] caus[ing] pain bilaterally . . . .")), as well as medical testing that show ongoing issues with her spine (*see, e.g.*, AR 046). Thus, Aetna's refusal to recognize Bergman's subjective, continuing, and at times verified pain symptoms adds to the Court's finding that Aetna abused its discretion in terminating Bergman's LTD benefits.

### 5. Bergman Provided Significant Objective Findings.

Bergman was required by the LTD plan to provide "significant objective findings" that "because of a medically-determined physical or functional impairment" she was no longer able "to perform the duties of [her] regular occupation." (AR 555-56.) Bergman's job description mainly described a customer service desk job, but it also involved moving customer packages and required her to be able to lift up to seventy-five pounds, a fact that the reviewing physician repeated multiple times in his analysis.[5] (AR 173-77; AR 185 (full job description).) Bergman

---

[5] Defendants point out that Bergman's job description could have been modified to not require the lifting of seventy-five pounds (AR 185; Def. Opp. at 11-12), but the required approval of this modification never occurred. (*See* AR-185.) Hence, the Court analyzes the job description as is, especially given that the reviewing doctor on appeal considered this requirement in his analysis. (*See* AR 172-77.)

submitted over forty medical documents for review of her appeal from at least five different medical professionals of varying specialties and covering a period of over a year which documented years of pain and other diagnoses. (AR 172-77.) The most recent examinations occurred in the weeks before her final decision, and many of the medical examinations and testing occurred in the months following the termination of her benefits, including a CT scan from the same imaging company that Bergman used to substantiate her earlier claim of disability.[6] (*Id.*)

Though, of course, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," the court cannot "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)); *see also Salomaa*, 642 F.3d at 679 ("Weighty evidence may ultimately be unpersuasive, but it cannot be ignored."). However, in this case, Aetna points to no reliable evidence it is crediting. Instead, it is simply arbitrarily refusing to credit Bergman's reliable evidence.

As an initial matter, Defendants bring to the Court's attention various comments from P.A. Bolton's and Dr. Kim's earlier medical examinations that they argue cut against Bergman's claim of disability. (*See, e.g.*, Def. MSJ at 2-4; Def. Opp. at 8, 12) (bolding phrase like "Plaintiff's head and neck exam was normal," she "had more pain and symptoms than what is typical for her type of injury," and Dr. Kim restricted her to "continued modified work at this time"). But these comments

---

[6] Defendants argue that any documents not in front of Aetna's initial reviewing board are "irrelevant" and should not be considered (Def. Reply at 8), but the Court's review is not so limited. The Court may review all of the documents in the administrative record, which includes those documents in front of both reviewing boards. *See Abatie*, 458 F.3 at 970. Moreover, the existence of significant objective findings after the date Aetna terminated Bergman's LTD benefits is relevant because it informs the reasonableness of the final decision relating to whether Bergman had a continuing disability. (Def. Reply at 8.) The record is also clear that Aetna's appeal reviewing board and the reviewing physician considered these documents and Bergman's injuries after December 31, 2014. (AR 001-03, 172-77 ("I have been asked if there are significant objective clinical documentation that reveals a functional impairment that would preclude the claimant of performing the essential duties . . . from 1/1/15 to the current time.").)

were made when Aetna initially determined Bergman was "disabled" under FedEx's disability plan (or a few days before). Hence, these observations show that Aetna understood that Bergman could have some normal testing or non-correlated symptoms and still substantiate a disability claim through other evidence. Moreover, when these types of test results and observations occurred later on, they show that Bergman was similarly situated to when Aetna already determined Bergman to be "disabled" and rebut any inference that Bergman was improving in these areas. Thus, the use of these type of findings to defend the reasonableness of Aetna's termination decision is not credible. (*See, e.g.*, AR 003 (reasoning "no significant deficits in range of motion or muscle strength, any neurological deficits or gait amoralities" supported termination); 006 (listing "no documented continuation of decreased range of motion" among the reasons for denial); Def. Reply at 4-6 (citing to other instances where Bergman's complaints of pain and physical abnormalities did not exactly line up); (Def. Opp. at 8-12 (arguing Bergman could work and was not disabled because her work was modified).)

In its initial termination letter, Aetna only lists the absence of certain medical findings and ignores the other significant ones, such as the positive Phalen's test, Dr. Kim's observation of the presence of radiculopathy after reviewing Bergman's x-rays, her diagnosis including stenosis, various pain and numbness complaints, and work status determinations and restrictions supporting a disability. (*See* AR 004-06, 043-45, 165.) Specifically, days before her denial, Dr. Warren examined Bergman, and stated her EMG did "not rule out the possibility of sensory radiculopathies." (AR 292.) Dr. Kim similarly confirmed Bergman's diagnosis of radiculopathy and continued to treat her and restrict her work abilities. (AR 043-45.) Aetna failed to rebut these significant objective findings with any credible evidence.

For the final termination decision, though the Court can find some reasonability in Dr. Cirincione's decision to discount Dr. Tran's observation of Bergman's decreased sensation in her upper extremities in light of her December

2014 EMG test (though these occurred four months apart), he did not provide any basis for ignoring her other reported symptoms and diagnoses, including Dr. Tran's other observations. (*See* AR 062 (detailing a decreased range of motion, pain in cervical spine, muscle spasms, and "cervical compression caus[ing] pain bilaterally").) For example, Dr. Cirincione noted Bergman's February 4, 2015 CT scan showed a solid two level fusion, but ignored the other notes showing Bergman had "posterior osseous spurring caus[ing] mild to moderate central canal stenosis as well as neural foraminal stenosis, similar to that seen on [the previous] MRI," "minimal to mild uncovertebral osseous spurring at C3-4 and C4-5," and "straightening of the cervical lordosis, positional or due to muscle spasm." (*Id.*) Dr. Cirincione also did not credit other evidence to rebut Dr. Kim's observations following the CT scan. (*See* AR 046.) (observing Bergman's cervical stenosis was "moderate-to-severe at C5-C6 [and] moderate at C6-C7" and that she had not significantly improved and was not functional); *see also* AR-054-56 (downgrading Bergman's status to totally disabled a month later).) Instead, Dr. Cirincione seemed to discount completely, and unreasonably, Dr. Kim's multiple medical examinations and work status reports because he could not speak to him on the phone. (*See* AR-176 (noting his "unanswered" questions for Dr. Kim).)

Nothing else in the record discredits Bergman's objective findings or supports that Bergman's objective findings were not significant. None of Bergman's examinations stated that Bergman's impairment ceased or that she was able to return to work at full capacity, or even to half capacity considering her extensive restrictions.[7] (*See* AR 165.) And not one physician indicated that Bergman was not

---

[7] The Court does not find, as Defendants argue, that Bergman could perform her work duties meaningfully following Dr. Kim's work restrictions. (*See* Def. Reply at 4.) Bergman was limited to lifting no more than ten pounds and to working no more than four hours a day with ten minute break every thirty minutes. (*See* AR 046-49; 165.) This recommendation allowed Bergman around three hours each day to perform her normal work duties, including desk work. Moreover, under the LTD plan's definitions, Bergman not only had an "Occupational Disability" but also a "Total Disability" because she could not work for more than twenty-five hours per week. (AR 559.)

genuine or fabricated her symptoms. Instead, her physicians continued to document and treat her symptoms and diagnoses with various medications and therapies, even if her complaints did not specifically link up with the physical findings. (*See, e.g.*, AR 047-49 (noting that the "CT scan looks better than what her symptoms are" but continuing to restrict her work duties to four hours, among other things); 050-52 (recommending further therapy for her back and shoulder muscles and treatment from her spine doctor, even though no specific pathology was identified for her hand pain); 061-63 (prescribing an extensive pain management plan).) The record shows Bergman had supported her disability claim with significant objective findings, and Aetna abused its discretion when it found otherwise.

### 6. The Court Will Not Consider Additional Evidence.

Lastly, Bergman asks the Court to consider the Social Security Administration's January 23, 2017 decision to grant her disability benefits as of April 5, 2016 in its review. (Pl. Reply at 9, Ex. 1.) Defendants object to this supplemental evidence, arguing that under the abuse of discretion standard, a court may only consider the evidence that was in front of the reviewing board at the time of its decision. The Ninth Circuit ruled in *Abatie* that, even when a court is applying the abuse of discretion standard, it may consider additional evidence if a procedural irregularity occurred, preventing a "full development of the administrative record." *Abatie*, 458 F.3 at 973 (finding a district court erred when it failed to consider a treating physician's declaration that the claimant remained disabled from when he left work until his death). It is not clear to the Court whether this exception would apply to evidence from outside this distinct review period, though Aetna recognized in their final decision letter that Bergman was awaiting a decision on her social security disability claim. (*See* AR-003.) Ultimately, however, the Court finds the Social Security Administration's decision does not affect the Court's determination, and thus declines to consider this as additional evidence.

## III. Conclusion

For the foregoing reasons, the Court **GRANTS** Bergman's Motion for Summary Judgment (ECF No. 21) and **DENIES** Defendants' Cross Motion for Summary Judgment (ECF No. 22).

The Court **ORDERS** the following briefing scheduling for the parties to address damages, including the effect of Bergman's retirement, her disability status (occupational v. totally disabled; temporary v. permanent), and any offsets on the amount of damages, as well as attorneys' fees:

(A)   Plaintiff's motion for damages, limited to ten pages, is due no later than **October 19, 2017**;

(B)   Defendants' opposition, limited to ten pages, is due no later than **November 2, 2017**

(C)   Plaintiff's reply, limited to five pages, is due no later than **November 9, 2017**.

The Court will reserve final judgment until after the issues of damages is decided.

**IT IS SO ORDERED.**


DATED:  **September 27, 2017**

Hon. Cynthia Bashant
United States District Judge

16cv1179